or Harris v. Tioga County at all? All right, so I guess I want to figure out how we're doing this. So Mr. Bernstein, you're going for four minutes now and then saving a minute for rebuttal. So you're both splitting eight minutes and then splitting two minutes of rebuttal. Is that right? I believe so, Your Honor. Okay, so you may proceed. If we may please the court, Jonathan Bernstein from Goldberg Segala for the defendants, County of Tioga and former District Attorney Keene. We ask for reversal and dismissal of a complaint against these two defendants. As far as DA Keene is concerned, we ask for absolute immunity as to him. The district court basically found an issue of fact on four various items that we believe are immaterial items as far as to waive the absolute immunity. Those dealt with specifically traveling with the state police to Albany to discuss with the forensic unit evaluating the evidence. You disagree with the district court's conclusions regarding what the facts are? It's not the facts, Your Honor. As far as for the purposes of this argument, it's the materiality of these facts to- The weighing of the evidence. You disagree with the district court's weighing of the evidence? Basically that they've taken basically four items and indicated that those- Well, we're taking the facts for the purposes of this appeal as alleged by the plaintiff. It doesn't seem that. It seems like you're actually disputing a lot of facts. Assuming that to be true, you then seem to be saying that those facts were not material to support the conclusion that the district attorney was not performing an investigative function as opposed to a prosecutorial, right? Because, for example, traveling to- For example, speaking with the ex-wife, all right? What about the exposure corrections, though? There was evidence in the record showing that he discussed the exposure corrections to lighten up the blood photographs, that he was involved in those corrections, and that was during the investigative phase. I mean, it was four years that passed before there was an indictment, and he was involved during those years. That's a manipulation of evidence that occurred during that time that seems related to all the sequelae. Why isn't that enough with respect to D.A. Keene? Well, what D.A. Keene said was he asked the state police, could they get a better quality of photograph so that he could eventually put that before a jury? It wasn't he was asking them to manipulate the photographs or anything. Nonetheless, he was involved in something that turned out to be material in the investigative phase before there was an indictment, right? He simply asked, can you give me a better set of photographs that I could use? And to that point, in the state's record on appeal on page 266 or 207, you can see the photographs. There's a band in it because there was a flash issue. So all that the D.A. was asking for is, can you give me something better, better quality? Well, nonetheless, and we can say that now, but as my colleagues are pointing out, why isn't that a disputed fact that's sufficient to bring D.A. Keene into the heavily disputed record in this case, which is a very long record and heavily disputed record that precludes our exercise of jurisdiction? Because what D.A. Keene is not doing, he's not going in, he's not at the scene, he's not collecting the blood. He's not taking the photographs. He's not in that part of the investigation. He's involved in the presentation and manipulation of the photographs. Can you give me something better? Well, I don't think he's involved in the manipulation of any photographs. But that's a factual disagreement. Whether he was involved, the extent of his involvement, do you agree that there is some evidence that he was involved in the investigation? What he testified to is that he did ask Investigator Anderson, can you get me better photographs? Well, he was on a trip, he traveled with Mulvey, participated in interviewing witnesses, as Judge Carney just mentioned, long before there was an indictment during the four-year investigation. Couldn't a reasonable jury conclude that he was involved in the investigation? But I think there has to be more than that. The involvement has to lead to a constitutional violation. What I'm saying is these individual things, going to the FBI to understand the investigation, going to Albany, investigating, discussing a witness that was not… But there's a conspiracy alleged as well that went on, I mean, four years again before an indictment occurred, where he was involved in a small community, a lot of people were involved, and there was investigation before a grand jury was convened. So, why isn't that still enough? Well, as far as… I'm sorry, Your Honor. To overcome the claim of absolute immunity at this phase. Well, as far as conspiracy is concerned, there's a case-led effect of Dory v. Ryan that alleged conspiracy for false evidence for a criminal trial still allows him for absolute… I'm sorry, we're having difficulty hearing you. I'm sorry. I'm saying Dory v. Ryan, 25 F3 to 81, second circuit, 1994, indicates that conspiracy to create false evidence in anticipation of a criminal trial, absolute immunity still applies. But that's an umbrella still over these specifics that we've just been talking about that Judge Chin has mentioned and that I've been describing regarding the alteration of photographs. And I'm sorry to belabor the point when I'm saying he's not altering the photographs. All he's asking for is better evidence. And, you know, anyone who's taking a case to trial, whether it be an expert or a witness, would say, can you get me a better set of evidence? There's only one set of prints here. It's in the olden… See, here we are talking about the evidence. We are talking about the evidence, yes, Your Honor. And that's Judge Chin's point, I think. But I'm saying that the evidence is not material to overcome him not getting absolute immunity, or at the very least, qualified immunity, because the items that he's doing are really just in anticipation of going and taking the case to trial, whether collecting it, talking about the photographs, going to see how the investigation is going, or just communicating. He doesn't manipulate any witnesses, for example. He doesn't manipulate any witnesses, for example. He met with Thayer before he was going to put her on the stand for the grand jury. Wachowski, they're not claiming that it was related to D.A. Keene. They're claiming that it's related to Moffitt. So there are certain items here that are just not related to D.A. Keene at all, that the district court just overlapped into attributing to him. All right. I see I'm out of time. So you've got a minute of rebuttal, but first we'll hear from Mr. Mix and then from Ms. Aldea. Thank you.  May it please the Court, Sean Mix, on behalf of State Appellants Susan Mulvey and Steve Anderson. The district court's decision in denying qualified immunity primarily relies on three inferences against defendants, all of which are blatantly contradicted by the record such that this court need not accept them here. Well, I mean, you're relying on a case that involved a video that was so explicit and clear that it contradicted the allegations of the plaintiff. But here it seems to me you're just talking about contradictions in the record. Why isn't that just a disputed issue of fact that can't be resolved on an interlocutory appeal? Well, yes. Scott involved a videotape, but we've pointed to other circuits. The Sixth Circuit in Wysom looked to documentary evidence. It looked to deposition testimony and found that the testimony did not say what the district court found it said. That's very similar to what we are saying here. With respect to the blood photographs, for instance, the district court found that a reasonable juror could find that state defendants knowingly manipulated photographs, and then Anderson invoked junk science to convince the jury that only red blood is fresh. But if you look at the grand jury minutes, you can see that only uncorrected photographs were used. Anderson's testimony in the grand jury, page 250, 251 of the supplemental appendix, points out the very flash problem sought to be corrected and explains that there is darkness here. It's washed out here. He describes that correction exposure problem. So that shows that the photographs had not been corrected at that point. And he actually warned against junk science. Immediately after he said that the blood appeared fresh in nature to me, he told the grand jury you cannot age blood, and he explained why. He said because other environmental factors can affect that, such as sunlight, temperature, and other things. So there's no danger of misleading the jury there. He's simply talking to a common observation. Look at his testimony there. And with respect to the blood, the alteration of the blood, the district court found a reasonable jury could find that Anderson knowingly manipulated the blood by field testing it before photographs were taken. And then he used obsolete science to suggest that it was- Three witnesses changed their stories. Yes, Your Honor. That's based on this inference that they changed them only after Mulvey had met with him. But the record undeniably shows, with respect to the hairdresser, that he had told a different police officer about the death threat days before Mulvey had met with him. And we cite to the dated- This still sounds like a jury argument rather than a videotape contradiction that is so blatant that no jury could find otherwise. It sounds like you're asking for inferences to be drawn, for experts to be believed or disbelieved. That seems to fall very short of the Scott exception. Respectfully, I disagree, Your Honor. In this case, with respect to the hairdresser, there's a time-stamped e-mail saying from Officer Drake, not Mulvey, not the defendant, to Mulvey saying, the hairdresser just called me. He wants to say he overheard Calvin make a death threat, wants you to call him back. Three days later, Mulvey calls him back and takes a statement that's consistent with that. So it's just not true that that statement changed only after speaking with Mulvey. And the same is true with respect to the babysitter. One of the issues was the disappearance of Michelle's clothing about a week after she left. The district court cited a diary entry. If you read that entry, the diary entry says, Calvin wanted Michelle's things out of the house. I bagged them up. Less than a week later, she tells a different state police officer, not Mulvey, the same incident, and describes Calvin as having packed up some of the things as well. Mulvey had not met with her then in between those two things, and those statements are entirely consistent with her grand jury testimony. So it's just simply not true that that statement changed, much less that it changed after Mulvey met with her. But, Mr. Mix, I mean, our authority is pretty clear on this. I mean, you've cited some out-of-circuit authorities. But Saleem proves, basically says an argument that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue is not something that we are going to resolve on an appeal like this. But in Raspardo v. Clone, which we cite in our second circuit case on qualified immunity, it's an interlocutory appeal. In a footnote, this court says, although generally we cannot do this, cites Scott and says because there's no substantiation, there's nothing in the record, it's blatantly contradicted. So this court has looked at Scott, and we cite that case in our brief. And again, other circuits have used this too, and it's in line with Scott. So there is an exception, and we urge you to please look at the sites that the district court cited, the sites in our brief. This isn't just about testimony from one officer saying this didn't happen, testimony from another saying it did. The testimony does not say what the district court found it said in many events. So we urge you to look at that. And one final point I'd like to just make, I know I'm out of time. The very theory of the case here is impossible. The district court on page 19 of its opinion said that after Calvin's first indictment was dismissed in 2007, state police were forced back to the drawing board, that's a quote, and then began fabricating evidence. But that is blatantly contradicted by the record, as all the relevant witness sites were provided to state police years before then. And Anderson's grand jury testimony is consistent with the field notes he made just days after Michelle disappeared. So that is just not true. All right, well, we're way over. I mean, that's sort of the challenge that comes with splitting an argument. But you've got a minute for both. Thank you, Your Honor. Thank you. Ms. Aldea, am I pronouncing that right? Aldea. Aldea, all right. So Ms. Aldea, you have ten minutes. Good morning, Your Honors. May it please the Court. My name is Donna Aldea. I represent Calvin Harris. Your Honors, as this Court insinuated during questioning, the Court lacks jurisdiction over the present appeal, and that is the threshold issue here. Here, the defendants claim that there is an exception that they can rely on where you have factual findings blatantly contradicted by the record. So I just want to go through some of the cases that they cite here because it is not like any of them. In fact, Scott, which is the seminal case that they rely on, actually supports the view and explains why this is exactly the opposite of the type of case that you can rely on there. Scott involved a situation where you had a video by which the district court did not have to draw inferences or rely on competing renditions of facts because it had a video that actually showed the high-speed chase that was at issue and what was going on during that chase. Here, in contrast to Scott, we have a situation where the entirety of the defendant's arguments and the entirety of their briefs and the entirety of what was discussed in the district court is based on their competing inferences about which facts from the record should be credited, which should not be, which inferences should be drawn. You're not saying that Scott is limited to the case where there's a videotape, are you? No, Your Honor, I'm not. I'm looking at the other cases. Where documents disprove a claim so profoundly that no reasonable jury could find otherwise, right? Yes, Your Honor, that is also true. And to get to those cases, a lot of the other cases that are cited involve situations where the plaintiff makes a declaration or a statement that is then at odds with the position that the district court finds in order to rule. And that is the exact opposite of what happened here, too, because they are not relying on the plaintiff's declarations they are relying on the self-serving declarations of the defendants to argue that certain inferences should be drawn from testimony. And again, the key here is that this court has held that this rule from Scott applies in rare cases, requiring a version of events that is so utterly discredited by the record that no reasonable jury could have believed it. In other words, a visible fiction. Here, looking at the record here in totality, there is more than ample evidence from which a reasonable jury could have concluded that these defendants acted together in a conspiracy to fabricate evidence on all of the most important elements and just to go through them quickly. They fabricated the element of motive. Specifically, that had to do with the fabrication of testimony by Mulvey and by District Attorney Keene about what Attorney Robert Miller told the police about the imminence of the trial. They fabricated evidence of intent. And that had to do with the fabricated evidence of the hairdresser, Wilsinski, who changed his story from 2001, claiming that he overheard a threat that Calvin would make Michelle's life difficult financially, to in 2007, after speaking to Mulvey significantly, ultimately had an altered version where he claimed he overheard a death threat. They fabricated evidence of the nonexistence of exculpatory evidence. And this was key. There was very probative exculpatory evidence that the prosecution knew of in this case and the investigators knew of early on. There was a phone call that Cal had made on the morning of Michelle's disappearance, where he called her cell phone and hung up at around 7.15 in the morning, knowing that this was devastating. And it truly was devastating, because if he had killed her, he never would have called her phone. And if he had tried to set up an alibi, he would have left a message saying, I'm so worried, where are you? So knowing that this was a devastating piece of proof for the defense, they got Barbara Thayer to take credit for that phone call when they knew that it was physically impossible for her to have made it, and when she made statements to the police stating explicitly right around that time that she had not made that call. And that happened after Mulvey spoke to Thayer. They created evidence of consciousness of guilt. And that was by, again, Mulvey speaking to Thayer and getting her to change her story about, from the fact that she's the one who bagged Michelle's clothing and put it in the laundry, she's the one who orchestrated a garage sale and told Calvin that she wanted to have a garage sale, where notably she stole the proceeds from the sale, lied to him and claimed that there was only $200 of profit when there was $2,000 of profit, and used that garage sale as a pretext to give a wedding plate that she stole from the Harris household without authorization for free to investigator Mulvey, so that they could then use that at trial to suggest that Cal so much did not care about Michelle and the marriage that he was actually giving away their wedding plates. They fabricated blood evidence, the physical evidence that was the heart of this case. The evidence that was recovered in this crime, in this household, to be clear, was not evidence of a crime. It was not evidence that Michelle had died in the house. To the contrary, it was evidence that she lived in the house. This was a total of less than 10 drops of blood that were located in the kitchen and garage of the family home, which was a location where months earlier prosecutors knew, Diakine knew, because his wife was her divorce attorney. He knew that she had cut her hand and had alleged that in the divorce papers that he had. And yet, in spite of that, they fabricated this evidence to try to show that this minuscule amount of blood, which was not only not probative of any kind of force or trauma occurring in the house, to the contrary, it was contrary to that. If your honors have ever seen a crime scene, and unfortunately I have, at least in photographs, that amount of blood with that amount within that location is simply contrary to any kind of blunt force trauma crime scene that was being alleged by the prosecution. But they fabricated that not only eliciting testimony in the grand jury that Michelle had never cut herself from a dozen witnesses who came in and said that she had never suffered any cut that bled because they had to address that withheld evidence, but then Anderson actually testified that he altered the blood stains in that photograph by swabbing them with a wet swab prior to photographing them. And then using the photographs of the wet swab to claim that the directionality or horizontal nature of the blood actually showed some form of force being applied. With respect to the photographs of the blood, as far as I can tell, Diakine wasn't present when the photographs were taken. And his participation in certain investigative actions, like going to interview the ex-wife in Boston, seemed quite unrelated to your general fabrication charges. So I'm having difficulty understanding what investigative acts he took that are relevant to your overall narrative here. Yes. So aside from the ones that I mentioned, with respect to the evidence, first I'll address what the district court relied on, which was his working with investigators over the course of four years. That was in a generic way. I mean, the things that were identified were the trip to Boston, the forensic unit, maybe one other thing. But he wasn't there when the photographs were taken. Maybe he asked, give me a better exposure with regard to film. But it really was extraordinarily limited before he was actually acting as a prosecutor. So can you focus on one particular thing that is material to your general claim here? Yes. So first, just in terms of how the district court relied on the general things, I think that was to show that he was working very closely with the investigators and was intimately involved and involved them in all of the things he did, meeting witnesses, going to speak to the FBI, going to conferences. The meeting witnesses was in preparation for their grand jury testimony. That's part of his prosecutorial functions. Well, that was a lot prior to the presentation in the grand jury. Some of that had occurred. So I think that was just the district court's way of saying there was evidence in this record that supports that he was intimately working with them in all phases in the investigative stage. But to more directly answer your honor's question with respect to the photographs, actually, district attorney. So in this case, there is a little bit of a fallacy with respect to the photographs that I do want to clear up. So the state defendants have argued here that only the uncorrected photographs were actually used at trial. And, you know, as your honor pointed out, District Attorney Keene did say prior to that, get me some better evidence here relating to the photographs. Well, here's what happened. First of all, it is absolutely not true that it was uncorrected photographs that were used to trial. That is false. The photographs that were introduced in the grand jury, which are part of the record on this appeal and were before the district court, had the grand jury stamp on them, the evidence stamp showing that they were actually put into evidence at both grand juries and at trial. Now, those photographs were redder. And we know that they were redder because in 2015, when the negatives were turned over, which again is part of the record, the negatives themselves were not as red as the photos that were produced. The negatives themselves also were developed into photographs that were not as red as the ones that were put in. So to the extent that the argument is only the untouched photographs were put in, that is just belied by the record. And Keene was involved in that because Keene said, give me better ones. And then later on, when he spoke to Henry Lee in 2006, prior to the second indictment, he also acknowledged at that point during that meeting about the photographs. He knew the photos were enhanced before he actually used them, put them in to the grand jury and then subsequently used them at trial. So that's the first stage of involvement. How do we know that the photographs were enhanced? In other words, who knows what the original actually looked like? I mean, when I take a photo with my phone, you can adjust it immediately and depending on the lighting, et cetera, what you have on your phone might look different from what's right there in reality. I mean, how do we know that they were enhanced? So for this, I'm going to actually rely on the defendant's briefs. They point out very clearly that this is prior to the age of digital photos and photos on cell phones. They can be enhanced, the color can be changed. These were film photographs that produced negatives. If you do not change the color on the negatives when you develop them, then they will produce a negative that is clear. And that negative will be the same however many times you develop it. We know that the photos were enhanced because the one set of photos that they claim were the unenhanced ones that bore the grand jury stamp showing those were the ones that were put into evidence were different than the color on the negatives, which were also produced to the defense and actually they were produced at the third trial. And at that time, those were developed and had a very different color. So we know that the photos that were used actually were enhanced. Additionally, getting back to what was done with respect to these photos, with respect to the aging of the blood, the defendants argue here that the testimony that Anderson gave in the grand jury actually did not pertain to the photographs but pertained more generally to his own observations. And I would direct the court to the record, A, appendix 1100, where Anderson prefaces his testimony by explicitly saying to the grand jury, as you can see in the photographs, the blood is very red here. And based on my experience and based on the training that I've taken, which is absolutely untrue because this was junk science as had been confirmed, based on the training, I know that this means that the blood was fresher. And then again, just to correct a statement that was made in the record, with respect to the hairdresser, the defense argued that there was evidence in the record that in fact the hairdresser had spoken to someone other than Mulvey. This is exactly what this appeal is about. This is a dispute of fact because there is also evidence in the record that the defense chooses not to highlight that says that Mulvey specifically testified that she was the one who first obtained this statement and first spoke to him, and it was her name on the lead sheet. And that is in the appendix at 1505. And that's the issue. It's a question of fact. It's not a question of law. All right. Thank you. Thank you, Your Honor. We'll now hear from Mr. Bernstein for a minute. Thank you, Your Honor. Your Honor, you picked up on the point that I was trying to make. Keene's involvement is very limited, and it's not significant. He didn't manipulate any witnesses. He didn't manipulate any witnesses. He didn't meet with the hairdresser that we've been discussing. He only met with Thayer before she was going to testify before the grand jury. He only asked that they get better quality photographs. Simply building up your case to present it shouldn't make it so that he loses his absolute immunity, or at the very least you should get his qualified immunity. So the significance, what I was saying before, is that the significance of what Judge Hurd relied upon is not significant. It's not material. It's not such that he wasn't at the scene of the crime picking up the evidence or taking the photographs or anything like that. With such a limited view, he should be able to talk to the investigator during the course of what's leading up to going to the grand jury so that at least the proof is in a way that he can present this to the grand jury. But he shouldn't lose his absolute immunity by simply inquiring or finding out what's going on or telling him to go back. If anything, that's a benefit to the plaintiff that the prosecutor's involved. He's giving some sort of adult supervision to the state police as they go about doing their thing. The other item is I submit that the Monell claim should be dismissed because all the items that are involved with the 18 are prosecutorial. I think that dichotomy between managerial and prosecutorial still exists in the Second Circuit. My final point, the malicious prosecution claim, I believe for the state malicious prosecution claim should be dismissed because there is no dichotomy between investigative and prosecutorial under state law. That was cited, too, in our brief. With that, I believe that I'm out of time. Thank you. All right, thank you very much. Mr. Mix, you have a minute for a vote. First, we cited several cases that invoke Scott, including one from this court where Scott was invoked where there was just simply no evidence confirming the allegations. Other courts have done it for deposition testimony, for physical evidence. I'd ask this court, please look at the citations in this case and, you know, look to what is actually being said. I know there's a lot said about the photographs. Look to Anderson's grand jury testimony. He describes the very problem sought to be corrected. With respect to the blood, he warns against using junk science. The junk science is the idea that with some level of scientific precision, you can determine the age of blood. That is separate from his statement that, in his experience, the blood appeared fresh. This is not a case where we're just relying on declarations denying wrongdoing. We are also relying on the evidence cited and simply saying that is not what it says. Look at the diary entry that the district court relied on with respect to the clothing. It says Calvin wanted Michelle's things out of the house. That's what the record says. The leads are the lead sheets. You know, counsel brought up Mulvey's deposition testimony about the hairdresser. She testified that she had called him back, was trying to refer to the lead. We have the lead here. It's lead 875. We cite to it in our brief. There's an email there that's timestamped. So I just encourage this court to really look at the evidence here. And there's no basis to it. That's clear what everybody's asking us to do. We're having what feels like a summation on facts. And you're asking us what weight to give to facts, what inferences to draw from facts. And that, I mean, I think you have to at least admit that's not what we typically do in an interlocutory appeal. We basically have the folks on your side of the lectern there saying even accepting everything these folks have said is true. As a matter of law, there is qualified immunity because there's whatever would be the reasonable and only inference that could be drawn. Yes, but we are not asking you to weigh them. We are asking you to look if there's a blatant contradiction. The Landis case cited by counsel, they noted that in looking for a blatant contradiction, that does entail some level of looking at what is cited and seeing if it is blatantly contradicted by something else. We just ask that you do that here. Thank you. We will reserve decision.